**Opinion issued July 22, 2014.**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-13-00073-CR**

———————————

**IRSAN ALFARO, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1316912**

---

**MEMORANDUM OPINION**

Irsan Alfaro was indicted for "impeding the normal breathing" of his wife

"by applying pressure" to her throat or neck—a third-degree felony assault.[1] The

jury convicted Alfaro and assessed punishment at the maximum allowed—ten

---

[1] TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.01(b)(2)(B) (West Supp. 2013).

years' confinement and a $10,000 fine. In two issues, Alfaro contends he was provided ineffective assistance of counsel because his counsel (1) failed to challenge the admissibility of Alfaro's statement to police that he "hit" his wife and (2) inadequately presented mitigating witnesses during the punishment phase of trial. We affirm.

## Background

Alfaro and his wife, Angela, had been married more than 15 years when, in August 2011, Alfaro was arrested for assaulting Angela in front of their children. At trial, Angela and the children testified at length about the assault, including that Alfaro hit her with his hands, whipped her with a belt, threw her to the ground, knelt on her chest, and choked her with his hands as well as his belt. The children were able to testify about the details of the assault because, according to them, Alfaro forced them to witness it.[2]

Angela testified that she and Alfaro had an argument the afternoon of the assault. Alfaro grabbed her by the hair and dragged her across the kitchen. The fight stopped for a while but later Alfaro became angry again. According to Angela, Alfaro took a knife from the kitchen and threatened her "not to provoke him" or he would kill her or one of their children. When Angela attempted to block

---

[2] The Alfaros have five children together. The youngest three testified that they witnessed the assault. The oldest two—who were no longer living at home—testified only during the punishment phase of the trial.

his entry to the children's bedroom, she said, he stabbed the knife into the door. Alfaro then called his children to the living room. Angela testified that "the only thing left was for him to beat me."

She explained what occurred next: "Again, he hit me. He threw me on the ground. He grabbed me with his hands here on the neck . . . He threw me on the floor . . . He hit me on my face." She testified that Alfaro choked her with his hands "to the point that I was not seeing clearly. It was very blurry." Besides choking her with his hands, she said he also put his belt around her neck, squeezing with a "lot of pressure, very hard." Angela testified that she thought she "was going to die." In fact, she said that Alfaro "asked the children if they wanted to see their mother die."

The children's account was the same. They testified that he stabbed the knife into the door when Angela attempted to close the door to protect them saying, "You're going to make me kill your children one day." The children testified that Alfaro told them to go to the living room and then began hitting Angela with his hands, using the belt "like a whip," and knocked her to the ground. "He got the belt and put it around her neck . . . He put his knee in her chest." They said that they screamed at him to stop. The children also testified that Alfaro's brother, Luis, who lived with the family, was in the home when the assault occurred. Alfaro did not call Luis as a defensive witness to deny these allegations.

3

Several days later, family members contacted police and requested they conduct a welfare check on Angela. Harris County Constable Sergeant L. Gonzales testified about his encounter with Alfaro that day and the visible bruises he witnessed on Angela. Photographs of her injuries were shown to the jury. Her children also testified that Angela had bruises and belt marks after the assault. T. Dusang, a forensic nurse examiner, testified as an expert about the severity of the injuries, including visible bruising on her neck, and that those injuries were consistent with strangulation.

When Alfaro testified, he denied hitting Angela and offered that the accusations against him were the result of a "conspiracy" led by his oldest daughters. The jury found Alfaro guilty of assault of a family member by impeding breathing.

During the punishment phase of the trial, Angela and the children recounted years spent in fear of Alfaro and detailed numerous beatings. Alfaro's uncle provided contrary testimony, telling the jury that Alfaro would be a good candidate for probation. During the uncle's testimony, however, it became clear that he was unaware of the abuse the family members had described, testifying he knew nothing of it. In the end, he agreed that knowledge of the abuse changed his opinion of Alfaro; yet he stated,"but now with this, maybe he would change."

4

The jury assessed punishment at the maximum allowed—10 years' confinement and a $10,000 fine.

## Ineffective Assistance of Counsel

Alfaro raises two issues on appeal—both alleging that his counsel provided him ineffective assistance in violation of the Sixth Amendment to the United States Constitution. U.S. CONST. amend. VI.

### A.     Standard of review

In *Strickland v. Washington*, the United States Supreme Court recognized that a criminal defendant has a Sixth Amendment right to effective assistance of counsel, observing the "crucial role" the right to counsel plays in our adversarial system. 466 U.S. 668, 685, 104 S. Ct. 2052, 2063 (1984); *see Ex parte Jimenez*, 364 S.W.3d 866, 882–83 (Tex. Crim. App. 2012). A criminal defendant claiming that trial counsel was ineffective must prove that (1) trial counsel's performance fell below an "objective standard of reasonableness" and (2) the deficient performance prejudiced his defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694, 104 S. Ct. at 2064, 2068; *Jimenez*, 364 S.W.3d at 883.

To determine whether Alfaro has shown counsel's performance was deficient under the first prong of the *Strickland* analysis, we look to the totality of

the representation and the particular circumstances of the case at the time of trial, ignoring the effect of "20/20 hindsight." *Jimenez*, 364 S.W.3d at 883; *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). We indulge a strong presumption that counsel rendered adequate assistance. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065; *Jimenez*, 364 S.W.3d at 883; *Ex parte White*, 160 S.W.3d 46, 51 (Tex. Crim. App. 2004). "To overcome the presumption of reasonable professional assistance, 'any allegation of ineffectiveness must be firmly founded in the record[.]'" *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (quoting *Thompson*, 9 S.W.3d at 813). Because there are "countless ways" to provide effective assistance, our scrutiny of trial counsel's conduct must be highly deferential. *Ex parte Rogers*, 369 S.W.3d 858, 862 (Tex. Crim. App. 2012) (quoting *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065).

Under the second prong of the *Strickland* analysis, we determine whether Alfaro has shown a reasonable probability that, but for his counsel's deficient performance, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068; *Andrews v. State*, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). What is required to meet the "reasonable probability" standard is a lesser burden that would be required under a more-likely-than-not standard. *Shanklin v. State*, 190 S.W.3d 154, 165 (Tex. App.—Houston [1st Dist.] 2005, pet. dism'd, improvidently granted). A reasonable probability is

6

"a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068.

"The two prongs of *Strickland* need not be analyzed in a particular order" on appeal. *Ex parte Martinez*, 330 S.W.3d 891, 901 (Tex. Crim. App. 2011). If we determine that Alfaro cannot establish prejudice as a result of the alleged error, we need not consider whether trial counsel's actions were ineffective. *Id.* at 904. We turn first to Alfaro's contention that his counsel was deficient by not challenging the testimony of Sergeant Gonzales that Alfaro admitted to hitting his wife.

**B.      Failure to challenge testimony regarding Alfaro's admission**

Sergeant Gonzales testified at trial that he asked Alfaro during the police welfare check if he hit Angela, and Alfaro said yes. Alfaro did not object or otherwise attempt to counter this testimony. On appeal, Alfaro complains that his "counsel provided ineffective assistance at the guilt-innocence phase of trial by failing to object to and develop a record regarding potential custodial statements made by [Alfaro] to Sergeant Gonzales." Alfaro argues that the police officer's testimony should have been challenged because (1) Alfaro was under arrest when he made the statement and (2) the police failed to provide him statutory or *Miranda* warnings before the statement was made. Sergeant Gonzales disputed that Alfaro was under arrest, stating that he was merely detained. Alfaro contends that there could be no strategic reason for his counsel to allow his admission into

evidence unchallenged and characterizes the admission as a "confession" which would be "necessarily harmful." Because application of the second prong of the *Strickland* test is dispositive of this issue, we begin there.

Under the *Strickland* second prong, we determine whether there is a reasonable probability that, but for counsel's actions alleged to be deficient, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at 687, 694, 104 S. Ct. at 2064, 2068; *Andrews*, 159 S.W.3d at 102. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068. We examine counsel's alleged errors in the context of the overall record. *Ex parte Menchaca*, 854 S.W.2d 128, 132 (Tex. Crim. App. 1993); *Aldrich v. State*, 296 S.W.3d 225, 256 (Tex. App.— Fort Worth 2009, pet. ref'd). Relevant to our inquiry is the extent to which other evidence existed supporting the jury's determination of guilt and the comparative significance the alleged error had on the outcome of the trial in light of that evidence. *See Sampson v. State*, 689 S.W.2d 498, 501 (Tex. App.—Houston [14th Dist.] 1985, no pet.) ("The evidence of guilt was overwhelming and could not have been overcome by trial counsel.").

### 1. Relationship of testimony to offense charged

The offense for which Alfaro was charged and convicted was third-degree felony assault of a family member committed by impeding the victim's normal

breathing. *See* TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.01(b)(2)(B). The testimony Alfaro claims should have been challenged by his counsel was that Alfaro admitted he had "hit" Angela, not that he choked her. Alfaro's counsel adequately explained the distinction between the two to the jury during closing argument:

> Now, what Sergeant Gonzales didn't say is that Mr. Alfaro said: "I hit her, I chased her with a knife, then I choked her with my hands, and then I choked her with a belt." If he is saying anything, he's saying my client confessed to a Class A assault of hitting her at some point. We're not even clear whether he allegedly confessed to something he did on the 17th [the date of the welfare check] or something on the 9th [the date Angela said Alfaro assaulted her]. That's not clear. . . . [T]he only issue we're dealing with is whether the felony assault of strangulation occurred. That's all we're here for. If other offenses occurred, they don't come in. All we look at is that one issue.

Thus, contrary to Alfaro's argument on appeal, the jury did not hear testimony that Alfaro "confessed" to the charged offense; at most he admitted that he hit his wife.

We are not persuaded that there is a reasonable probability that—had Alfaro's counsel successfully excluded testimony that Alfaro "hit" Angela—the result of his trial on the offense of assault by strangulation would have been different. This is in part due to the distinction between the two acts discussed above and, as discussed below, the other overwhelming evidence of guilt.

## 2. Overwhelming evidence of guilt

The evidence that Alfaro choked Angela was overwhelming. Angela testified that Alfaro choked her with his hands to the point that she "was not seeing

9

clearly." Besides choking her with his hands, she testified that he put his belt around her neck, squeezing with a "lot of pressure, very hard." The children's account was the same. They testified that Alfaro "got the belt and put it around her neck . . . ." The children testified that Angela had bruises and belt marks after the assault. Both Sergeant Gonzales and the expert forensic nurse testified about the severity of Angela's injures, including visible bruising on her neck. The forensic nurse examiner testified further that Angela's injuries were consistent with strangulation. And the jury was shown photographs of those injuries.

Given this record, we cannot conclude that there is a reasonable probability that the outcome of Alfaro's trial would have been different had his counsel successfully excluded evidence that Alfaro admitted that he hit his wife. *See Sampson*, 689 S.W.2d at 501 ("The evidence of guilt was overwhelming and could not have been overcome by trial counsel."); *Trybule v. State*, 737 S.W.2d 617, 620 (Tex. App.—Austin 1987, pet. ref'd) ("[T]here was overwhelming evidence of guilt, and the nature of the crime clearly warranted the punishment imposed."); *see also Strickland*, 446 U.S. at 696, 104 S. Ct. at 2069 (stating that trial is less likely to be affected by error if evidence in record overwhelmingly supports conviction).

Because Alfaro has not met his burden on the second *Strickland* prong, we overrule issue one. *Id.* at 694, 104 S. Ct. at 2068.

**C.    Failure to interview and call potential mitigation witnesses during punishment phase of trial**

In his second issue, Alfaro contends that his trial counsel was ineffective because he failed to interview or call three witnesses who would have testified favorably for Alfaro during the punishment phase of the trial and failed to "adequately prepare" the witness who was called on his behalf.

A criminal defense lawyer must have a firm command of the facts of the case to render reasonably effective assistance of counsel. *Ex Parte Ybarra,* 629 S.W.2d 943, 946 (Tex. Crim. App. 1982); *Ex parte Duffy,* 607 S.W.2d 507, 516 (Tex. Crim. App. 1980). Counsel has the responsibility to seek out and interview potential witnesses. *Ex parte Duffy,* 607 S.W.2d at 517. We cannot view defense counsel's conduct as evidence of a trial strategy if counsel has failed to conduct the necessary factual investigation to enable him to develop an informed, rational trial strategy. *Id.* at 526; *Ex parte Welborn*, 785 S.W.2d 391, 393 (Tex. Crim. App. 1990); *see also Shanklin*, 190 S.W.3d at 164–65 (stating there can be no "strategy" to not call witness if counsel had no knowledge concerning testimony witness would have offered). Because application of the second prong of the *Strickland* test is dispositive of this issue, we begin there.

Under the *Strickland* second prong, we determine whether there is a reasonable probability that, but for counsel's actions alleged to be deficient, the result of the proceeding would have been different. *See Strickland*, 466 U.S. at

687, 694, 104 S. Ct. at 2064, 2068; *Andrews*, 159 S.W.3d at 102. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S. Ct. at 2068. Thus, we consider whether a reasonable probability exists that the jury would have assessed a less severe punishment but for the allegedly unprofessional representation. *See Milburn v.* State, 15 S.W.3d 267, 270 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). To do so, we consider the omitted testimony in light of the other evidence presented to the jury for its consideration during the punishment phase.

### 1. Punishment evidence presented to jury

All five children testified against their father, recounting years of abuse and fear. Jessica, who was nineteen at the time of trial, testified that Alfaro beat them from "the earliest memory that I have." During one instance, Alfaro pulled Jessica's hair, slammed her head against the hood of a car, knocked Angela to the ground, took a knife from the kitchen, and, according to Jessica, said that "he was going to kill me." Jessica testified that Angela ran to the bedroom of Alfaro's brother, Luis, who came out, took away the knife, and calmed Alfaro.

Dalia, then eighteen years old, testified that Alfaro often hit her mother and the children. She testified at length about a different incident when Alfaro hit her with a belt, grabbed her sister and hit her with the belt until she bled, pointed a knife at another child, and stopped the assault only when her uncle, Luis,

12

intervened to calm him down. Dalia also testified about another incident when Alfaro beat her with a belt and choked her. Again, the jury was told that Angela asked Luis for help, and Luis intervened and stopped the attack.

Jennifer, their twelve-year-old, testified about these events and confirmed that Alfaro often beat her as well, using his belt "like a whip." She said the beatings left her with bruises and, at least once, the belt drew blood.

Kenia, their fifteen-year-old daughter, also testified about Alfaro threatening the family with a knife and Uncle Luis taking the knife away from him.

Irsan, who was sixteen, testified next. He said Alfaro once "pointed the knife at us acting like he was going to stab me and my mom." He stated that his father would beat his mom "daily." On at least one of these occasions, Irsan called for Uncle Luis to come out of his bedroom and stop the assault.

Finally, the complainant testified. Angela discussed her fifteen-year marriage to Alfaro, stating that he beat her almost from the beginning. She also testified about an incident that occurred while she was at work and the oldest children were at school. Alfaro left the house, abandoning their two-year-old and one-year-old there without any supervision. Alfaro received two years' deferred adjudication probation for child abandonment. She testified about frequently needing Luis to protect her and her children from Alfaro: "[H]e would try to help my daughters and [me] in situations like this."

13

Also during the punishment phase, Alfaro presented his uncle who testified that Alfaro would be a good candidate for probation. During his testimony, however, it became clear that the uncle was unaware of any abuse, testifying that he knew nothing about it. In the end, he agreed that the knowledge he obtained at trial changed his opinion of Alfaro; however, he offered that "now with this, maybe he would change."

### 2. Unoffered testimony

In support of his motion for new trial, Alfaro attached affidavits from three family members who stated that they were available to testify on Alfaro's behalf during the punishment phase of the trial but were never interviewed or called as witnesses. These individuals, their relation to Alfaro, and the testimony they aver they would have offered is listed below:

- Edwin is Alfaro's brother. He states that he would have testified that "I know my brother and because of it I attest that he is responsible and worked."

- Hector is Alfaro's brother-in-law. He would have testified as follows: "I know him and he has been a good father, responsible. The kids never lack anything. During the time that I knew his wife, everything was fine, there was not family abuse. He's always been a working man and always watchful of his family. As far as I know he has never had any problems with the law. He has been an honest and tranquil man [who] has always maintained his home. He got along with his kids. His kids would always call him by phone. I knew that his second daughter had behavior problems.

- Luis is Alfaro's brother. He lived with the Alfaro family in 2011. He states in his affidavit: "All of his kids were accusing him. I Luis Alfaro in 2011 lived with my brother. I always thought that my nieces were wrong not my

14

brother. He always worked so that they lack nothing. Never asked for help to the government, that is why he worked hard."

Alfaro does not contend that any of these witnesses' testimony was relevant to his guilt or that his attorney committed professional error by failing to call them during the guilt-innocence phase of the trial. His complaint is limited to counsel's failure to call them as mitigating witnesses during the punishment phase.

During the guilt-innocence phase of the trial, Alfaro had emphatically denied assaulting his wife. Through its verdict, the jury necessarily found more credible the testimony of Alfaro's wife and children. During the punishment phase of the trial, Angela and the children testified that several incidents of abuse had ended only when Uncle Luis intervened and stopped Alfaro. Had Alfaro's counsel allowed Luis to testify, he would have been subject to cross-examination which possibly could have led to even more detailed accounts of the beatings and the steps Luis found necessary, in the moment, to protect Alfaro's wife and kids. He either would have testified that the beatings occurred, which would have been harmful to Alfaro's case, or he would have testified that the beatings had not occurred, which could have negatively impacted his credibility as a witness given that he failed to testify at all in the guilt-innocence phase of the trial. Either way, allowing Luis to testify and, by necessity, subjecting him to cross-examination may have caused more harm than good.

15

Further, according to Alfaro, Luis would have testified that he thought the family's problems were the children's fault. We note that Luis's affidavit does not deny that any beatings occurred; it merely asserts that his nieces—and not Alfaro—were "wrong." We are not persuaded that a reasonable jury would have imposed a lesser sentence had Alfaro's counsel elicited such testimony.

Edwin averred that he planned to testify that his brother "is responsible and worked." The absence of this testimony was unlikely to have affected the punishment assessed given the lengthy testimony from Alfaro's wife and children recounting their abuse. *See Dotson v. State*, Nos. 14-98-00590-CR, 14-98-00591-CR, 1999 WL 1123037, at *4 (Tex. App.—Houston [14th Dist.] Dec. 9, 1999, pet. ref'd) (mem. op., not designated for publication) (finding appellant failed to establish harm under second prong of *Strickland* regarding uncalled witnesses, who would have testified appellant held steady job and was hard worker but who had not acknowledged knowing anything of appellant's extensive criminal record); *Alvarado v. State*, No. 04-03-00289-CR, 2006 WL 332536, at *9–10 (Tex. App.—San Antonio Feb. 15, 2006, pet. ref'd) (mem. op., not designated for publication) (overruling ineffective assistance of counsel issue where counsel failed to call witnesses who would have testified appellant was "responsible and hard worker").

Hector's affidavit indicated that he planned to testify more directly than the other two about Alfaro's relationship with his wife and children. Hector averred

16

that he would have described Alfaro as a "good father, responsible" and would have testified that "there was not family abuse." His affidavit described Alfaro as "an honest and tranquil man that has always maintained his home. He got along with his kids." A reasonable probability does not exist that the outcome of the sentencing would have been different had this witness—who did not testify in the guilt-innocence phase—claimed during the punishment phase that the abuse simply did not occur. *See Alvarado*, 2006 WL 332536, at \*9–10 (finding persuasive counsel's statement that he did not call family members to testify during punishment phase because attempts to re-litigate guilt are unhelpful).

The strong evidence supporting a finding of guilt in combination with the detailed accounts of persistent abuse given by Angela and all of their children likely would have overwhelmed any benefit that might have resulted from the testimony of these three uncalled witnesses. We, therefore, conclude that the absence of this testimony did not undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694, 104 S. Ct. at 2068; *cf. Trybule*, 737 S.W.2d at 620 ("The harm alleged by appellant is that he received the maximum punishment authorized for the crime charged. Our view of the evidence is that, even with the best of representation, the jury would have probably assessed such punishment . . . [T]here was overwhelming evidence of guilt, and the nature of the crime clearly warranted the punishment imposed.").

### 3. Preparedness of uncle who testified

Alfaro also complains that the mitigation witness who did testify on his behalf during the punishment phase was ill-prepared by his counsel, specifically stating that "it was apparent that Mr. Rivera [Alfaro's uncle] was not fully informed about the nature of the proceedings or its underlying facts." Similar to the other three witnesses, we conclude that Alfaro is unable to establish that his counsel's conduct, even if considered deficient, harmed him sufficiently to meet the second prong of *Strickland*, 466 U.S. at 687–88, 694, 104 S. Ct. at 2064, 2068.

Rivera testified on direct that Alfaro was, in his opinion, a good candidate for probation who would follow the rules of the Court and the law if given probation. He then states that the church they attended provides counseling services, which he would encourage Alfaro to seek. On cross-examination, Rivera indicated that he was unaware that Alfaro had been convicted of abuse, that he had never been told of any abuse in the Alfaro home, and that he did not know Alfaro has been the subject of a CPS investigation or been placed on probation for abandoning his children at home without any supervision. Rivera did know that one of the children previously ran away, though he did not know it was in response to abuse. At the conclusion of the cross-examination, this exchange occurred:

Q.   Now that you know all of these things, does that change your opinion about the defendant's character?

A.   Does it change?

Q. Yes. Now that you know all of these things—you said that he has a good character.

A. Yes, yes.

Q. Does any of this change your opinion?

A. Mine or his or whose?

Q. Your opinion.

A. Well, I believe so, yes.

Q. How?

A. For his behavior, the way he's been behaving.

Q. What does it change your opinion to then?

A. I—I did not know of what was happening, but now with this, maybe he would change.

Alfaro complains that Rivera reversed his opinion of Alfaro in front of the jury and this harmed Alfaro's chances for a more lenient sentence. While Rivera's position did alter from a beginning position of full support to a more neutral position at the end, the record does not indicate that Rivera fully recanted his support. Rivera concluded his testimony by stating that, after the trial, "maybe he would change." We view this statement as still somewhat supportive of Alfaro or, at a minimum, neutral.

Viewing the totality of the record, as we are required to do in a *Strickland* challenge, we do not conclude that the failure to provide Rivera more information in preparation for his testimony undermined confidence in the outcome of the trial. *Thompson*, 9 S.W.3d at 813; *Estrada v. State*, 882 S.W.2d 21, 23–34 (Tex. App.— El Paso 1994, no pet.). Had he been given more detail, perhaps he would have been

19

unwilling to testify at all—in which case the jury would have been denied his more positive comments.

Given the overwhelming evidence of guilt, the testimony from the entire family of the abuse they endured, and the violent account of Alfaro choking Angela, we do not conclude that the outcome would have been different, with reasonable probability, had Rivera been provided more details of the trial testimony concerning Alfaro's violent past before Rivera testified on Alfaro's behalf.

Alfaro has not demonstrated that he was prejudiced by his counsel's failure to call the three witnesses he identified or to arm his uncle with more information in preparation for his testimony. We, therefore, overrule Alfaro's second issue.

## Conclusion

Having overruled both of Alfaro's issues, we affirm the judgment of the trial court.

Harvey Brown
Justice

Panel consists of Justices Keyes, Bland, and Brown.

Do not publish. TEX. R. APP. P. 47.2(b).

20